## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-81567-CIV-ALTMAN

**ESDRAS CARDONA**,

    *Petitioner,*

*v.*

**RICKY D. DIXON, SECRETARY,**
**DEPARTMENT OF CORRECTIONS**,

    *Respondent.*[1]

_____/

### ORDER

Our *pro se* Petitioner, Esdras Cardona, challenges his 2007 state conviction for sexual battery and burglary (with assault or battery). *See* Petition [ECF No. 1] (challenging his conviction under 28 U.S.C. § 2254). After careful review, we **DISMISS** Ground One of the Petition as procedurally barred and **DENY** the remaining claims on the merits.

### THE FACTS

The State of Florida charged Cardona by Information with two counts: sexual battery (Count 1) and burglary with assault or battery (Count 2). *See* Information [ECF No. 18-2] at 12–13. Cardona took the case to trial, where a state jury found him guilty of both counts. *See* Verdict [ECF No. 18-2] at 15. For these crimes, a state judge sentenced Cardona to 15 years in prison on Count 1 and 20 years for Count 2—to be served concurrently. *See* Judgment and Sentencing Orders [ECF No. 18-2] at 22–25.

---

[1] The original Respondent in this case, Mark S. Inch, retired from his position as Secretary of the Florida Department of Corrections on November 19, 2021. Former Secretary Inch's successor, Ricky D. Dixon, has been automatically substituted as the Respondent. *See* FED. R. CIV. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

Cardona appealed his conviction and sentence to Florida's Fourth District Court of Appeal. *See generally* Direct Appeal Initial Brief [ECF No. 18-2] at 36–76. In that appeal, Cardona advanced four arguments: (1) that the trial court erred in "allowing [Detective] Krauel to testify to [the victim's[2]] hearsay statements . . . [which] improperly bolstered [the victim's] credibility before she testified," *id.* at 51–52; (2) the trial court admitted inadmissible hearsay by "allow[ing] [Detective] Sandman to testify what the kitchen manager Ruano told her Cardona said in Spanish," *id.* at 52; (3) the trial court erred in overruling an objection to Detective Sandman's testimony "that Cardona was being untruthful," *id.*; and (4) the trial court failed to determine whether Detective Recarey "was skilled in Spanish and could fairly and accurately act as an interpreter" after defense counsel objected to the accuracy of Detective Recarey's translation of a statement Cardona (allegedly) made, *id.* at 52–53. The Fourth DCA affirmed the conviction and sentence in an unwritten opinion on April 20, 2011, *see Cardona v. State*, 59 So. 3d 122, 122 (Fla. 4th DCA 2011), and its mandate issued on May 20, 2011, *see* Direct Appeal Mandate [ECF No. 18-2] at 133.

While Cardona's direct appeal was pending before the Fourth DCA, his trial counsel filed a "Motion for DNA Testing" in the trial court under FLA. R. CRIM. P. 3.853.[3] *See* Motion for DNA

---

[2] Under Florida law, "[a]ny information that may reveal the identity of a person who is the victim of any sexual offense" is considered confidential and is exempt from public filing. *See* FLA. STAT. §§ 119.071(2)(h)(1)(b), 119.0714(1)(h); *see also* FLA. R. GEN. PRAC. & JUD. ADMIN. 2.420(d)(1)(B)(xiii) (requiring the clerk of court to keep all "[p]rotected information regarding victims of child abuse or sexual offenses" confidential). That's why we ordered the Respondent to file an "unredacted Corrected Response, accompanied by unredacted exhibits and transcripts" under seal. Order Requiring Corrected Response [ECF No. 16] at 2. And, to protect the victim's identity, we'll refer to her either by her initials ("M.L.") or as "the victim." For consistency's sake, we'll also refer to certain material witnesses by their initials.

[3] Rule 3.853 is a mechanism by which a Florida criminal defendant can obtain "postconviction DNA testing." *Alvarez v. Att'y Gen. for Fla.*, 679 F.3d 1257, 1260 (11th Cir. 2012). To prevail under Rule 3.853, the movant must submit "a statement that the movant is innocent," "a description of the physical evidence containing DNA to be tested," and an explanation of "how the DNA testing of each item requested would give rise to a reasonable probability of acquittal or a lesser sentence." *Hitchcock v. State*, 866 So. 2d 23, 27 (Fla. 2004) (quoting FLA. R. CRIM. P. 3.853(b)). Once the state judge determines that the motion is facially sufficient, the court must order the DNA testing if: (1) "it has

Testing [ECF No. 18-2] at 135–65. That motion asserted that Cardona was innocent of the charged offenses and argued that testing the "victim's sexual assault kit," the victim's clothes, and several items found near the victim's bed would show "the presence of male DNA other than Mr. Cardona or the victim's boyfriend." *Id.* at 143, 152. The State filed a Response to Cardona's Motion for DNA Testing, contending that no additional DNA testing could possibly exonerate Cardona. *See* State's Response to Motion for DNA Testing [ECF No. 18-2] at 178 ("Here, a thorough reading of the trial transcript leads to the inescapable conclusion that justice has prevailed and the defendant's conviction for sexual battery and burglary with assault or battery is sound.").

On June 22, 2009, the state court granted in part and denied in part Cardona's Motion for DNA Testing. *See* DNA Testing Order [ECF No. 18-2] at 234–47. Although the court "recognize[d] that the State's evidence, especially the victim's identification, was strong," it allowed DNA testing of every piece of evidence that "would produce a reasonable probability that the defendant would have been acquitted." *Id.* at 240–41 (cleaned up). The trial court ultimately ordered DNA testing of the following items: the victim's "vaginal swabs," the victim's right and left "fingernail scrapings," a "pick from [the] fingernail scraping," the victim's tampon, the "victim's clothing," the "victim's bedsheet," a t-shirt found on the victim's bed, and the "oral standards" of Cardona, the victim, and the victim's boyfriend. *Id.* at 245. Notably, the trial court *did not* allow Cardona to conduct a DNA test of some hair that was found on (and around) the victim's bed. *See id.* at 243 ("The court denies the defendant's

---

been shown that physical evidence that may contain DNA still exists"; (2) "the results of DNA testing of that physical evidence likely would be admissible at trial"; and (3) "there is a reasonable probability that the movant would have been acquitted or would have received a lesser sentence if the DNA evidence had been admitted at trial." *Alvarez*, 679 F.3d at 1260 (quoting FLA. R. CRIM. P. 3.853(c)(5)). One important caveat: "[A] Rule 3.853 proceeding involves an application for discovery only, pursuant to which the court lacks authority to order relief from the movant's sentence or conviction based on DNA test results." *Brown v. Sec'y for Dep't of Corr.*, 530 F.3d 1335, 1337 (11th Cir. 2008). Instead, the movant can use those results as "a basis for a successful collateral attack on his judgment of conviction" by filing a motion for postconviction relief under FLA. R. CRIM. P. 3.850. *Id.* at 1337–38.

request to test the hairs on the T-shirt and the bedding. The [Florida Supreme Court] consistently has affirmed the denial of motions for postconviction DNA testing of hairs at crime scenes.").

After the court denied his motion for rehearing, *see* Order Denying Motion for Rehearing [ECF No. 18-2] at 248–53, Cardona appealed the trial court's DNA decision to the Fourth DCA, *see generally* DNA Appeal Initial Brief [ECF No. 18-2] at 253–300; *see also* DNA Appeal Initial Brief [ECF No. 18-3] at 1–6. Cardona raised two arguments in this appeal: (1) that the trial court erred in granting the State's request "to divide the evidence and send only a portion of the sexual battery kit to the Orchid Cellmark private lab . . . without hearing any evidence on this issue," *id.* at 268; and (2) that the trial court erred by "denying [Cardona's] motion for testing, pursuant to Rule 3.853, of the hairs collected at the scene of the crime that contain the potentially exonerating DNA profile of the attacker," *id.* at 269.

On February 6, 2013, the Fourth DCA agreed with Cardona on both issues and reversed the trial court. *See Cardona v. State*, 109 So. 3d 241, 248 (Fla. 4th DCA 2013). *First*, the appellate court said that, "before determining that splitting or cutting of DNA evidence was warranted, the trial court should have held an evidentiary hearing where the parties could have presented evidence on the effect of splitting or cutting the DNA evidence." *Id.* at 247. *Second*, the Fourth DCA held that "there is a reason to believe that the hairs on the bed belonged to the perpetrator[.]" *Id.* The Fourth DCA then ordered the trial court to allow "DNA testing of the hairs on the T-shirt and bedding" and "to hold an evidentiary hearing on the issues of the scope and procedure for testing the items for DNA evidence." *Id.* at 248.

Based on the Fourth DCA's opinion, the DNA testing went forward, *see* Forensic Report [ECF No. 18-4] at 21–24, but Cardona sought no further relief based on those results, *see generally* State Court Docket [ECF No. 18-2] at 2–5 (indicating that Cardona took no further action based on the DNA results); *see also* Amended Postconviction Motion [ECF No. 18-3] at 84–148 (failing to argue that the

DNA results exonerated Cardona); State's Postconviction Response [ECF No. 18-3] at 152 ("The DNA testing by an independent laboratory . . . is now complete. The testing is indisputably not exonerating. The [postconviction] DNA testing done during the relinquishment period shows no Y-STR profiles were obtained from the fingernail scrapings, or from any of the other samples submitted for testing.").

On March 20, 2012, while the Fourth DCA was still deciding the DNA-testing issue, Cardona filed a *pro se* Motion for Postconviction Relief[4] under FLA. R. CRIM. P. 3.850. *See* Original Postconviction Motion [ECF No. 18-3] at 56–82. A year later, on April 18, 2013, Cardona—now represented by counsel—filed an amended motion, which "abandon[ed] any claims raised in [Cardona's] *pro se* Motion for Postconviction Relief that are not raised in this Amended Motion." Amended Postconviction Motion [ECF No. 18-3] at 84 n.1.

In this Amended Postconviction Motion, Cardona pressed the following six arguments: (1) that newly discovered evidence, consisting of new testimony from the victim's boyfriend (R.J.), indicated that the victim had "a possible pecuniary interest in the outcome of the trial," that she was "intoxicated" at the time of the alleged sexual battery, and that the trial testimony of the victim and her boyfriend "was either incorrect or even fabricated," *id.* at 95–109; (2) that trial counsel was ineffective for failing to "call two key witnesses—[J.B. and A.U.]—who were both available at trial and would have provided evidence favorable to Cardona," *id.* at 109–26; (3) that trial counsel was ineffective for failing to call Cardona's brother, Manuel Jesus Cardona, who "would have provided corroboration of Cardona's alibi," *id.* at 126–28; (4) that trial counsel was ineffective for failing to present expert testimony that "the lack of male DNA under [the victim's] fingernails was scientifically

---

[4] "Under the 'prison mailbox rule,' a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009). "Absent evidence to the contrary, [courts] assume that a prisoner delivered a filing to prison authorities on the date that he signed it." *Jeffries v. United States*, 748 F.3d 1310, 1314 (11th Cir. 2014).

inconsistent with the State's argument that the scratches on Cardona were made by [the victim] during the struggle," *id.* at 128–31; (5) that trial counsel was ineffective "for failing to object to the improper imposition of the sexual predator designation," *id.* at 131–36; and (6) that these errors created a "cumulative prejudice" that "undermined confidence in the outcome [of the trial]," *id.* at 136–43.

In its Response to the Amended Postconviction Motion, the State conceded that "the Court improperly designated [Cardona] as a Sexual Predator, and that the designation as such should be stricken." *Id.* at 166. But it urged the postconviction court to strike the improper designation and to deny the rest of the Amended Postconviction Motion. *See id.* ("Wherefore, the State of Florida respectfully requests this Honorable Court to deny the Amended Motion for [Postconviction] Relief."). On April 4, 2017, the postconviction court granted Ground 5 of the Amended Postconviction Motion and "vacat[ed] Cardona's designation as a sexual predator." Order Denying Amended Postconviction Motion [ECF No. 18-4] at 181. It also "adopt[ed] the State's Response to [Cardona's] Amended [Postconviction] Motion, as this Court's findings of fact and conclusions of law," and denied the balance of the motion. *Id.* at 182. In doing so, however, the state postconviction court denied Cardona's newly-discovered-evidence claim "without prejudice" so that Cardona could supply "an affidavit of [R.J.] subject to the penalty of perjury to support [Cardona's] claim of newly discovered evidence in Ground 1." *Id.* at 183.

Cardona submitted an affidavit, signed by R.J., on April 20, 2018. *See* Notice of Filing Required Affidavit [ECF No. 18-4] at 185–88. In his affidavit, R.J. alleged that "[the victim] was buying drugs from Cardona"; that, before R.J. gave his recorded statement to law enforcement, "the investigator told me what he wanted me to say. I felt pressured and gave a statement consistent with what he told me to say"; that the victim offered J.B. and A.U. money "to provide favorable testimony"; and that the victim believed that "she wouldn't get any money" from her civil lawsuit unless Cardona was convicted. Affidavit of R.J. ("R.J. Aff.") [ECF No. 18-4] at 190–91. The State filed a supplemental

response to this affidavit, arguing that the state postconviction court should deny the last remaining postconviction claim because "the newly filed affidavit of [R.J.] is inherently incredible and obviously immaterial to the defendant's verdict and sentence." State's Second Postconviction Response [ECF No. 18-4] at 205. On November 15, 2018, the state postconviction court adopted the State's Second Response "as this Court's findings of fact and conclusions of law" and denied the remaining newly-discovered-evidence claim with prejudice. Order Denying Newly Discovered Evidence Claim [ECF No. 18-10] at 59–60.

For the third time, Cardona filed an appeal to the Fourth DCA—this time to challenge the state postconviction court's denial of his Amended Postconviction Motion. *See generally* Postconviction Initial Brief [ECF No. 18-10] at 62–114. In this appeal, Cardona challenged the state postconviction court's summary denial of his claims.[5] *See id.* at 80 ("Because the circuit court summarily denied Claims 1, 2, 3, 4, and 6 below, giving no independent explanation . . . and because none of these facially sufficient claims are conclusively refuted by the trial record, this Court should reverse the circuit court's order and remand for an evidentiary hearing on all claims."). On September 26, 2019, the Fourth DCA affirmed the state postconviction court in an unwritten opinion. *See Cardona v. State*, 280 So. 3d 66, 66 (Fla. 4th DCA 2019). The appellate court issued its mandate on October 25, 2019. *See* Postconviction Appeal Mandate [ECF No. 18-10] at 118.

**THE LAW**

## I.     The Antiterrorism and Effective Death Penalty Act ("AEDPA")

AEDPA instructs district courts to deny any claim that was "adjudicated on the merits" in a state-court proceeding unless that adjudication "resulted in a decision that was contrary to, or involved

---

[5] Of course, Cardona did not appeal the state postconviction court's favorable determination that he was improperly designated as a "sexual predator" under Florida law. *See* Order Denying Amended Postconviction Motion [ECF No. 18-4] at 181 ("[T]he Court . . . entered an Agreed Order Granting Ground 5 and vacating Cardona's designation as a Sexual Predator on April 4, 2017.").

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (summarizing 28 U.S.C. § 2254(d)–(e)). To have "adjudicated [the claim] on the merits," the state court need not have issued any kind of formal opinion or even outlined its reasoning. *Id.* at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Rather, when a state court doesn't articulate its reasons for the denial, the federal court must "'look through' the unexplained decision to the last related state-court decision that does provide a rationale" and "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). "Clearly established Federal law" means "the holdings, as opposed to the dicta, of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To be "contrary to clearly established federal law, the state court must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a different result from the Supreme Court when faced with materially indistinguishable facts." *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010) (cleaned up).

For "a state court's application of [Supreme Court] precedent" to be "'unreasonable, the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003) (cleaned up). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Richter*, 562 U.S. at 101. "And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is

required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (cleaned up).

Section 2254(d) similarly prohibits federal judges from reevaluating a state court's factual findings unless those findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To establish that a state court's factual findings were unreasonable, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155–56 (quoting 28 U.S.C. § 2254(e)(1)).

"AEDPA's standard is intentionally difficult to meet." *Woods*, 575 U.S. at 315 (cleaned up). When reviewing state criminal convictions on collateral review, "federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 316 (cleaned up).

Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The *Brecht* harmless-error standard requires habeas petitioners to prove that they suffered "actual prejudice." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir. 2012). As the Supreme Court recently explained, while the passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht*'s actual-prejudice requirement. *Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022). In other words, a habeas petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 1526 ("[O]ur equitable precedents remain applicable 'whether or

not' AEDPA applies." (citing *Fry v. Pliler*, 551 U.S. 112, 121 (2007)). In short, a "federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests." *Id.* at 1524 (emphasis in original); *see also Mansfield*, 679 F.3d at 1307 ("[A] habeas petition cannot be successful unless it satisfies both [AEDPA] and *Brecht*.").

## II. AEDPA's Procedural Requirements

"[A] person in custody pursuant to the judgment of a State court" has one year to file a habeas petition in federal court. 28 U.S.C. § 2244(d)(1). That one-year period "runs from the latest of" the following dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)–(D). But this limitations defense is waivable. *See Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 655 (11th Cir. 2020) (explaining that the State may express its intent to "waive the limitations bar").

Beyond meeting this one-year window, though, federal habeas petitioners must also *exhaust* their claims by "*properly* present[ing] [them] to the state courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (emphasis in original). Specifically, federal habeas petitioners must "fairly present every issue raised in [their] federal petition to the state's highest court, either on direct appeal or on collateral

review." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (cleaned up). "If a petitioner fail[ed] to 'properly' present his claim to the state court—by exhausting his claim[ ] and complying with the applicable state procedure—prior to bringing his federal habeas claim, then [§ 2254] typically bars [courts] from reviewing the claim." *Id.* In other words, where a petitioner has not "*properly* presented his claims to the state courts," the petitioner will have "procedurally defaulted his claims" in federal court. *O'Sullivan*, 526 U.S. at 848.

All that said, "[s]tates can waive procedural bar defenses in federal habeas proceedings, including exhaustion." *Vazquez v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 964, 966 (11th Cir. 2016) (cleaned up)). But "[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, *expressly* waives the requirement." 28 U.S.C. § 2254(b)(3) (emphasis added); *see also McNair v. Campbell*, 416 F.3d 1291, 1304 (11th Cir. 2005) (same).

### III.    Ineffective Assistance of Counsel

The Sixth Amendment affords a criminal defendant the right to "the Assistance of Counsel for his defen[s]e." U.S. CONST. amend. VI. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, a habeas litigant must demonstrate "that (1) his counsel's performance was deficient and 'fell below an objective standard of reasonableness,' and (2) the deficient performance prejudiced his defense." *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 957 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 687–88).

To establish the first prong (deficiency), "a petitioner must [show] that *no* competent counsel would have taken the action that his counsel did take[.]" *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (emphasis added). So, if "some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial[,]" counsel could not have performed

11

deficiently. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (quoting *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992)).

As for the second prong (prejudice), "a defendant is prejudiced by his counsel's deficient performance if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To succeed on this prong, however, a defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

## ANALYSIS

Cardona's Petition asserts five grounds for relief—the same five claims the state postconviction court denied. In Ground One, Cardona argues that the state postconviction court's finding that "[R.J.'s] affidavit could be rejected as inherently incredible" was an "unreasonable determination of the facts." Petition at 4–5. In Ground Two, Cardona claims that his trial counsel "was ineffective in failing to investigate and present [J.B.] and [A.U.]" at trial because (he says) both witnesses "would have impeached the alleged victim and provided strong evidence to suggest [the victim] was impaired during the crime." *Id.* at 6–8. In Ground Three, Cardona maintains that his trial counsel "was ineffective in failing to investigate and present [Cardona's] brother Manuel Jesus Cardona whose testimony would have supported [Cardona's] alibi." *Id.* at 9–10. In Ground Four, he says that trial counsel was ineffective "for failing to call a DNA expert where such testimony would have directly contradicted the State's expert's explanation for a lack of DNA underneath [the victim's] fingernails." *Id.* at 11–12. In Ground Five, Cardona castigates the postconviction court for denying his "cumulative prejudice" claim. *Id.* at 13–14.

Before we tackle Cardona's five claims, though, we need to take care of some preliminary housekeeping. We'll start with timeliness. The Respondent concedes that the Petition is timely. *See* Corrected Response to Order to Show Cause ("Response") [ECF No. 17-1] at 7 ("As the instant petition was filed on November 14, 2019[,] a total of twenty-one (21) days of untolled time passed. Thus, it appears that the petition is timely."). We'll accept that waiver and treat the Petition as timely. *See Day v. McDonough*, 547 U.S. 198, 209–10 (2006) ("[A] district court is not required to doublecheck the State's math [for timeliness purposes].").

Next, we conclude that AEDPA's deferential standard of review—as set forth in 28 U.S.C. § 2254(d)—applies to Cardona's claims because the state court "adjudicated [each] claim on the merits." *Richter*, 562 U.S. at 99. Because the Fourth DCA didn't explain its reasoning in a written opinion, *see Cardona*, 280 So. 3d at 66, we "look through the unexplained decision to the last related state-court decision that does provide a relevant rationale," *Wilson*, 138 S. Ct. at 1192. As we've said, the state postconviction court denied Cardona's five claims in two separate orders. *See* Order Denying Amended Postconviction Motion [ECF No. 18-4] at 181–83 (denying what are now Grounds Two, Three, Four, and Five); Order Denying Newly Discovered Evidence Claim [ECF No. 18-10] at 59–60 (denying what's now Ground One). In both orders, the state postconviction court adopted the State's Postconviction Responses "as this Court's findings of fact and conclusions of law." Order Denying Amended Postconviction Motion [ECF No. 18-4] at 182; Order Denying Newly Discovered Evidence Claim [ECF No. 18-10] at 60. We thus presume that *both* the state postconviction court *and* the Fourth DCA adopted the arguments the State pressed in those responses. *See Dragic v. Inch*, 2021 WL 836883, at *9 (S.D. Fla. Mar. 5, 2021) (Altman, J.) ("Since the [Fourth DCA] affirmed without a written decision, we 'look through' to the next reasoned decision (i.e., the trial court's Order Denying Post Conviction Relief, which incorporated the State's Response) as the presumptive reasoning of the Fourth DCA.").

Lastly, we find that Cardona has properly exhausted Grounds Two, Three, and Four.[6] Exhaustion "has two essential requirements": (1) "a federal claim must be fairly presented to the state courts"; and (2) the petitioner "must take his claim to the state's highest court, either on direct appeal or collateral review." *Johnson v. Florida*, 32 F.4th 1092, 1096 (11th Cir. 2022) (cleaned up). The Respondent concedes that Grounds Two, Three, and Four were "raised in [Cardona's] state post conviction motion and [that] the trial court's denial was affirmed by the [Fourth DCA]." Response at 23, 26, 35. We'll accept this as an "express waiver" by the Respondent of an exhaustion defense as to these three claims. *See Vazquez*, 827 F.3d at 966 ("States can waive procedural bar defenses in federal habeas proceedings, including exhaustion." (cleaned up)); *Brown v. Dixon*, 2022 WL 1197657, at *4 (S.D. Fla. Mar. 15, 2022) (Altman, J.) ("Our Respondent, in a section titled 'Exhaustion and Procedural Bar,' concedes that Brown presented Grounds Two and Three of his Petition to the State courts. As far as we can tell, this is the Respondent's express waiver, so we accept it." (cleaned up)).[7]

We turn, then, to the claims themselves.

### A.   Ground One

Ground One, remember, challenges the state postconviction court's denial of Cardona's newly-discovered-evidence claim (*i.e.*, R.J.'s affidavit)—a denial that, Cardona says, was "based on an unreasonable determination of the facts in light of the evidence present[ed] in the state court proceeding." Petition at 4. Specifically, Cardona maintains that the postconviction court erred when

---

[6] As we're about to see, the same can't be said for Ground One. With respect to Ground Five—the cumulative-prejudice claim—we think exhaustion is a closer call, so we'll skip the exhaustion inquiry and deny that claim on its merits.

[7] Even if the Respondent hadn't *expressly* waived its exhaustion defense as to these claims, we would've found that Cardona had properly exhausted them anyway. All three grounds assert claims of ineffective assistance of counsel, *see* Petition at 6–12, and Cardona presented each claim to both the state postconviction court and the Fourth DCA, *see* Amended Postconviction Motion [ECF No. 18-3] at 84–148; Postconviction Initial Brief [ECF No. 18-10] at 93–111; *cf. Nieves v. Sec'y, Fla. Dep't of Corr.*, 770 F. App'x 520, 521 (11th Cir. 2019) ("[E]xhaustion usually requires not only the filing of a FLA. R. CRIM. P. 3.850 motion, but an appeal from its denial." (cleaned up)).

it "rejected [the affidavit] as 'inherently incredible.' . . . without affording an evidentiary hearing to make that determination." *Id.* at 4–5. The Respondent advances three counter-arguments: (1) that "[t]his claim is unexhausted as Petitioner did not raise this as a federal claim and based his argument only on state evidentiary cases and rules," Response at 13; (2) that the state courts properly found R.J.'s affidavit unreliable based on his history of recanting other sworn testimony and his estranged relationship with the victim, *see id.* at 19 ("[R.J.] specifically stated he had a malevolent purpose in his first recantation to hurt [the victim] due to a divorce and broken relationship."); and (3) that R.J. affidavit's would have had no effect on the outcome of the trial because "the evidence in this case was substantial and compelling," *id.* at 20. Because we agree with the Respondent's first argument, we dismiss Ground One as procedurally barred.

A habeas petitioner *must* show "that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). That's because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). At the heart of Ground One is Cardona's view that the postconviction court should've held an evidentiary hearing before concluding that R.J.'s affidavit was incredible. *See* Petition at 5 ("[T]he court entered its finding that [R.J.] was inherently incredible—without affording an evidentiary hearing to make that determination *and herein lies the error*. Such finding required credibility determinations that only an evidentiary hearing could have resolved." (emphasis added)). But the Eleventh Circuit has been pellucid on this issue: "[W]e have stated it is 'beyond debate' that a state court's failure to conduct an evidentiary hearing on a post-conviction motion does not constitute a cognizable claim for habeas relief." *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1365 (11th Cir. 2009) (citing *Anderson v. Sec'y for Dep't of Corr.*, 462 F.3d 1319, 1330 (11th Cir. 2006)); *see also Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1987) ("Neither the state court's failure to hold a hearing on petitioner's 3.850 motion or its failure to attach the relevant portions of the record in any way undermines the

validity of petitioner's conviction."); *Petit-Homme v. McNeil*, 2009 WL 1884399, at *10 n.16 (S.D. Fla. June 30, 2009) (Moreno, J.) ("[A]n infirmity in a state post-conviction proceeding does not raise a constitutional issue cognizable in a federal habeas petition."). In short, Cardona's claim that the state court couldn't find R.J.'s affidavit incredible "without affording an evidentiary hearing to make that determination," Petition at 5, isn't cognizable here, *see Carroll*, 574 F.3d at 1366 ("Carroll's claim that the state court violated his due process rights by failing to conduct an evidentiary hearing under [FLA. R. CRIM. P. 3.850] . . . does not state a claim on which this Court may grant habeas relief.").

There is, it's true, one narrow exception this rule. Habeas relief may be available where a petitioner shows that the state court's "*fact-finding procedure* itself violated federal law." *Landers v. Warden, Att'y Gen. of Ala.*, 776 F.3d 1288, 1296 (11th Cir. 2015) (emphasis added). But Cardona never suggests that he fits into this narrow exception. He never, for instance, contends that the state postconviction court's decision on R.J.'s affidavit violated any federal law. *See* Petition at 4–5 (failing to cite any federal law on this issue). In fact, he's *never* relied on federal law to support his newly-discovered-evidence claim—not in his Amended Postconviction Motion[8] and not in his Postconviction Initial Brief to the Fourth DCA. *See* Amended Postconviction Motion [ECF No. 18-3] at 95–109 (relying only on state law); Postconviction Initial Brief [ECF No. 18-10] at 81–93 (same). He's thus failed to show that the

_____

[8] Admittedly, in his Amended Postconviction Motion, Cardona raised ineffective assistance as an alternative basis for relief on what's now Ground One. *See* Amended Postconviction Motion [ECF No. 18-3] at 109 ("Alternatively, if this Court finds that the information from [R.J.] was available to defense at the time of trial, then Cardona's counsel, Michael Amezaga, was deficient for not discovering such information and presenting it during trial."). And we probably should give him the benefit of the doubt and assume that, in blaming his lawyer, Cardona was (at least obliquely) invoking the Sixth Amendment. Even if we construed the Amended Postconviction Motion that way, though, we'd still find that Cardona failed to exhaust this alternative "federal" claim because he never re-raised it *either* in his Postconviction Initial Brief to the Fourth DCA *or* in this Petition, *see* Postconviction Initial Brief [ECF No. 18-10] at 81–93 (not making this argument); Petition at 4–5 (same); *cf. Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1284 (11th Cir. 2012) ("A failure to exhaust occurs, in turn, when a petition has not fairly presented every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." (cleaned up)).

state court's fact-finding procedure itself violated federal law. *See Baldwin v. Reese*, 541 U.S. 27, 33 (2004) ("The petition provides no citation of any case which might have alerted the court to the alleged federal nature of the claim."); *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 458–59 (11th Cir. 2015) ("[The petitioner] did not cite a single federal case, and relied instead on a panoply of Florida cases discussing the element of premeditation, as defined by state law. He never mentioned the federal Due Process Clause, or, indeed, any other federal constitutional provision."). Since Ground One challenges the state court's decision to find an affidavit "inherently incredible" without conducting an evidentiary hearing—and because Ground One relies on no federal laws, cases, or principles—we **DISMISS** Ground One under § 2254. *See Anderson*, 462 F.3d at 1330 ("Therefore, insofar as Petitioner's claim is based on the state court's failure to hold an evidentiary hearing, jurists of reason would not debate whether the district court properly dismissed this claim.").

### B.  Ground Two

In Ground Two, Cardona blames his trial counsel for failing to call two witnesses—J.B. and A.U. These witnesses worked with the victim and R.J. and "regularly socially interacted" with the couple. Amended Postconviction Motion [ECF No. 18-3] at 109–10. Cardona outlines three things that (he believes) these witnesses would have said: (1) that the victim "had a pecuniary interest in the outcome of the criminal proceedings against [Cardona] . . . and [that] [she] went as far as lying under oath and making efforts to fabricate and manipulate evidence to protect that pecuniary interest"; (2) that the victim "was intoxicated on the evening of the alleged rape, impeaching previous sworn testimony and calling her memory and judgment into question"; and (3) that Cardona "could not have physically entered the alleged victim's building to have the opportunity to commit this alleged crime." Petition at 6–7. In addition, according to Cardona, A.U. would have testified that the victim "was moved into a very nice condo" by her attorney in a related civil case and that A.U. thought this unnamed attorney had "coached" the victim to testify in a certain way. *Id.* at 7. The Respondent calls

the proposed testimony "irrelevant," "immaterial," "cumulative," and "inadmissible" and insists that counsel could not have been ineffective for failing to call these witnesses. *See* Response at 24–25.

The decision to call (or not to call) specific witnesses "is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." *Waters*, 46 F.3d at 1512. Still, counsel can be ineffective for failing to call a witness if the petitioner shows that the decision wasn't strategic at all. *See Forrest v. Fla. Dep't of Corr.*, 342 F. App'x 560, 563–64 (11th Cir. 2009) ("If counsel made the decision not to call Washington for strategic reasons . . . then this court would not provide relief for such strategic decisions by counsel."). Even if the petitioner makes this showing, though, he must also establish prejudice by demonstrating a reasonable probability that, had the jury heard the witness's testimony, the outcome of the trial would have been different. *See Body v. United States*, 568 F. App'x 760, 762–63 (11th Cir. 2014) ("Although Bell's potential testimony may have cast some doubt upon the other evidence introduced at trial, this is insufficient to show that the jury would have believed Bell's testimony over all the evidence in the record.").

In denying Ground Two, the state postconviction court adopted the State's Response. *See* Order Denying Amended Postconviction Motion [ECF No. 18-4] at 182 ("[T]he Court hereby adopts the State's Response to [Cardona's] Amended Post-Conviction Motion, as this Court's findings of fact and conclusions of law."). In that response, the State offered four arguments in support of its position that Ground Two should be denied. *First*, on the victim's "pecuniary interest" in the case, the State noted that "trial counsel . . . thoroughly explored[,] on the victim's cross examination[,] the fact that the victim signed a retainer agreement with a civil lawyer [within] one month of the attack." State's Postconviction Response [ECF No. 18-3] at 160. In other words, the State said, this aspect of J.B. and A.U.'s proposed testimony was just cumulative of things the jury had already heard during the trial. *Second*, on the victim's intoxication, the State pointed out that, according to *her own trial testimony*, the victim had been drinking earlier that night—meaning that any additional testimony on this issue would

likewise have been redundant. *Id.* at 158 ("The victim herself testified at trial that she had consumed one half of a bottle of wine before the rape, so the fact she had been drinking is nothing remarkable or new."). *Third*, the State maintained that "[t]estimony as to whether the defendant was physically capable of obtaining entry into the victim's building is likewise conjecture[.]" *Id.* at 159. *Fourth*, with respect to A.U.'s "theory that the victim was being 'coached' by her attorneys," the State noted, "it is long-standing Florida law that a witness should not testify as to the undisclosed intention or motive of a third person." *Id.*

The state courts reasonably applied *Strickland* in denying Ground Two. We'll start with the obvious ones: The jury heard all about the victim's intoxication on the night of the rape, and counsel deftly addressed, *both* in cross-examination *and* during closing argument, the victim's decision to hire a civil lawyer—a decision that gave her a pecuniary interest in the outcome of the case. *See, e.g.*, Trial Tr. [ECF No. 19-2] at 674 ("[Q:] [Y]ou testified that you had about half a bottle of wine; is that right? A: Yes. Q: By yourself, right? A: Yes."); *see also id.* at 672 ("Q: Now, the retainer agreement that you signed with your civil lawyer included a clause for a percentage of money that you might recover; is that right? A: It did have something in there, if there was anything."); *id.* at 875–76 ("[Defense Counsel:] Well, you saw [the victim] come into this courtroom and struggle, struggle to admit that she has a lawyer and that she is intending to file a civil lawsuit. Instead of admitting to you that, yeah, she wants to file a lawsuit after this case; that she wants to recover money; that she hired a lawyer back within a month after the alleged incident and wants to recover money . . . . Instead of admitting to you that that's what she wants out of the case, she tells you, oh, I'm not going to file a civil lawsuit, I don't want any money out of this case. I don't care what happens."). As the Eleventh Circuit has explained, federal courts rarely grant habeas relief when the petitioner's "new" evidence is merely cumulative of other evidence the jury already considered. *See Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1296 (11th Cir. 2012) ("[I]t is reasonable for a state court to conclude that a petitioner

suffers no prejudice when the [new] evidence is either weak or cumulative of the testimony presented at trial."); *cf. Ether v. Dixon*, 2022 WL 1908918, at *19 (S.D. Fla. June 3, 2022) (Altman, J.) ("Remember that 'a petitioner cannot satisfy the prejudice prong of the *Strickland* test with evidence that is merely cumulative of evidence already presented at trial.'" (quoting *Rose v. McNeil*, 634 F.3d 1224, 1243 (11th Cir. 2011))).

As for the remaining aspects of the proposed testimony—that A.U. *thought* the victim was being "coached" to lie or that, in J.B. and A.U.'s opinion, Cardona *couldn't* have entered the victim's bedroom—the state postconviction court determined that these were speculative under state law. *See* State's Postconviction Response [ECF No. 18-3] at 158–59 ("Testimony as to whether the defendant was physically capable of obtaining entry into the victim's building is likewise conjecture, as is [A.U's] theory that the victim was being 'coached' by her attorneys, as indicated by her increasingly conservative wardrobe."). Our review of Florida law strongly suggests that these decisions were correct. *See, e.g., Shiver v. State*, 564 So. 2d 1158, 1160 (Fla. 1st DCA 1990) ("[I]t has been stated that a witness should not testify to the undisclosed intention or motive of a third person."). In any event, it's simply not our role, under the auspices of federal habeas review, to disturb state evidentiary rulings. *See Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997) ("[S]tate courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters."); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law."); *Haag v. Sec'y, Dep't of Corr.*, 2017 WL 6550884, at *13 (M.D. Fla. Sept. 25, 2017) ("Haag's unsubstantiated contention that counsel should have called Dr. Carpenter to testify is insufficient to warrant relief. Moreover, [the state court] concluded that the proposed testimony would have been inadmissible under state evidentiary rules."). Since "counsel is not ineffective for failing to raise claims reasonably considered to be without merit"—and given that the proposed testimony was either cumulative or else inadmissible under state law—Cardona has failed to show that

his trial lawyer acted deficiently. *See United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000); *see also Ether*, 2022 WL 1908918, at *14 ("[C]ounsel cannot be faulted for failing to raise frivolous objections[.]"); *Krecht v. United States*, 846 F. Supp. 2d 1268, 1284 (S.D. Fla. 2012) (Ryskamp, J.) ("Of course, counsel is never deficient for failing to raise a meritless claim[.]").

Even if trial counsel had behaved deficiently in failing to call these witnesses, though, Ground Two would still fail because Cardona cannot show prejudice. The crux of Ground Two, remember, is that J.B. and A.U. would've called into question the victim's testimony that Cardona had entered her room that night. *See* Petition at 8 (arguing that the testimony of J.B. and A.U. "would have impeached the alleged victim and provided strong evidence to suggest she was impaired during the crime"). But, even without the victim's testimony, the evidence that Cardona was in that room was simply overwhelming. Cardona, after all, left behind a white tank top in the victim's bedroom that was identical to a white tank top the police later found in his closet. *Compare* Trial Tr. [ECF No. 19-2] at 319 ("[The victim] identified a white T-shirt that was laying on the bed itself, . . . it was a white V-neck T-shirt, tagless undershirt, it was a size medium, male medium, 38 to 40-inch shirt."), *with id.* at 330 ("In the second drawer of the dresser [in Cardona's room], we found a tank top exactly described as the one we found in [the victim's] room, a man's Hanes type of a T-shirt, a size [medium], 38 to 40 in the drawer folded."). The victim also testified that the perpetrator was wearing dark blue shorts, *id.* at 612–13 ("Q: And do you recall the color of those shorts? A: They were dark blue."), and—just a few hours after the crime—Cardona was found wearing (you guessed it) a pair of blue shorts, *id.* at 394 ("Q: Okay. And what did you see when the defendant arrived? A: He was standing there in a pair of blue shorts.").

On top of all this, the State adduced powerful DNA evidence. Law enforcement located a toothbrush in the victim's bedroom—and Cardona's DNA was found on that toothbrush. *Id.* at 420 ("[Q:] And where did you collect the toothbrush from? A: The toothbrush was found in the victim's

room[.]"); *id.* at 778 ("Mr. Cardona is the source of the DNA profile obtained from the toothbrush."). Indeed, the State's DNA expert testified that there was a "one in 21 quintillion" chance that the DNA belonged to someone *other* than Cardona. *Id.* The expert was thus willing to say, "with a hundred percent accuracy[,] that the DNA found on the toothbrush was a match or that the defendant was the source of that DNA on the toothbrush[.]" *Id.* at 778–79. This *physical* evidence corroborated much of the victim's claims—and neither J.B. nor A.U. would've had anything to say about it. That's sufficient for us to find that Cardona failed, in Ground Two, to establish *Strickland* prejudice—even if his lawyer had behaved deficiently. *See Fortenberry v. Haley*, 297 F.3d 1213, 1228 (11th Cir. 2002) ("[T]he absence of exculpatory witness testimony from a defense is more likely prejudicial when a conviction is based on little record evidence of guilt.").

We thus **DENY** Ground Two on the merits.

### C.  Ground Three

In Ground Three, Cardona excoriates his trial counsel for failing to call his brother, Manuel Jesus Cardona, to testify at trial. According to Cardona, Manuel would have testified that "[Cardona] spent the evening in Manuel's room watching television on the evening of the alleged rape," and that the scratches on Cardona's body were the result of "skin allergies" that were present before the night of the rape. Petition at 9. In denying this claim, the state postconviction court adopted the State's Response, which argued—as the Respondent does here—that Cardona couldn't have been prejudiced by Manuel's absence because (1) Manuel couldn't say that Cardona was with him at the time of the rape and (2) Manuel's testimony would've contradicted Cardona's own statements. *See* State's Response [ECF No. 18-3] at 163–64 ("Regardless of which of the defendant's inconsistent versions of events are considered, the defendant was not in his brother's room at 4:00 A.M. when the rape occurred. Thus, the purported evidence of the brother as set forth in the pending motion that the defendant spent the night of the rape in the brother's room watching videos cannot constitute a legally

and factually sufficient alibi defense."); Response at 31 ("Petitioner made contradictory statements to [Detective] Recarey as to his whereabouts at the time of the sexual battery which would have made his brother's alleged testimony incredulous.").

Here, again, the state court reasonably applied the dictates of *Strickland*. To understand why, we need to review Cardona's own statements about where he was that night. At trial, Cardona testified that, after leaving work at 11:30 PM, he watched a wrestling match with his brothers for about 30 minutes before returning to his bedroom. *See* Trial Tr. [ECF No. 19-2] at 807 ("Q: What did you do during that half an hour? A: I was watching wrestling with my brothers. Q: What did you do after that half an hour? A: I went to my room."). After remaining in his room for about 15 minutes, Cardona said, he went to a friend's room "to listen to music" and to "help[ ] him pack some boxes." *Id.* at 808. Cardona testified that he stayed with his friend for about 90 minutes before returning to his own room for the rest of the night. *See id.* ("Q: What did you do during that hour and a half, approximately? A: I told my friend that it was late, and I was going to my room."). Under Cardona's version of events at trial, in other words, he was with Manuel until about 12:00 AM, then with a friend until about 2:00 AM, and then went home for the night.

Cardona gave a slightly different timeline in his statements to Detective Recarey. At trial, the detective testified that Cardona told him he'd watched wrestling with Manuel from "between 12:30 and [1:00 AM] . . . [u]ntil approximately [3:00 AM]." Trial Tr. [ECF No. 19-2] at 580–81. And, in a still-earlier statement to Detective Recarey, Cardona said that "he didn't do anything that evening at all, other than go to sleep." *Id.* at 584.

Ultimately, these discrepancies in Cardona's timeline are kind of immaterial because *it's undisputed*[9] that the victim fell asleep around 1:30 AM and that the sexual battery occurred at about

---

[9] Cardona challenged much about the victim's testimony. But one thing he has never challenged—not here and not at trial—was the victim's assertion that the rape happened at around 4:20 AM.

4:20 AM. *See id.* at 608 ("Q: So what time was it when you went to sleep that morning? [The Victim:] I would say around 1:30-ish [AM], 1:40, right around there."); *id.* at 712 ("I was awoken by loud banging and thumping. I rolled over, looked at my clock and it was about 4:20 in the morning."). According to Cardona's own statements, then—both what he said to the police and what he told the jury—he wasn't with Manuel (or anyone else) at the time of the rape. Manuel's testimony that "[Cardona] spent the evening in Manuel's room watching television" would thus have had no "reasonable probability" of affecting the outcome of the case because Cardona *admitted* that he wasn't with his brother when the rape occurred. *See Isom v. Sec'y, Fla. Dep't of Corr.*, 569 F. App'x 660, 664 (11th Cir. 2014) ("When weighed against the testimony actually presented at trial, Defendant's proposed testimony does not create a [reasonable] probability that the outcome of the proceeding would have been different.").

Nor would Manuel's testimony about the source of the "scratches" on Cardona's neck have been useful to Cardona's defense. At trial, the State argued that the red scratch marks on Cardona's body were evidence of his late-night struggle with the victim. *See* Trial Tr. [ECF No. 19-2] at 889 ("You can observe the pictures. Are these consistent with someone scratching themselves and wearing a belt? . . . That's consistent with somebody having been in a struggle, [the victim] pushing [him], forcing him away from her so she could get over this."). Manuel now says that he could've testified about the source of these marks. According to the Petition, Manuel was prepared to explain that the scratches were self-inflicted—partly because Cardona "suffered skin allergies at the time of the alleged rape and often scratched himself," and partly because of "a leather belt worn [by Cardona] while weight-lifting." Petition at 9. While this account would've dovetailed nicely with Cardona's own trial testimony, *see* Trial Tr. [ECF No. 19-2] at 813 ("My neck, I have a habit of scratching it."); *id.* at 814 ("Q: And what about these marks on your back, how did you get those? A: I do exercises and I wear a belt."), it is totally *inconsistent* with what Cardona told Detective Recarey on the day of the sexual

battery, *see id.* at 582–83 ("A: I asked him how did he acquire those scratches, how did he get those scratches on his neck. Q: Did he even know he had scratches on his neck? A: No, he didn't."); *id.* at 583 ("He claimed that he didn't know how he acquired those scratches."). But that isn't all: Several *other* witnesses *directly contradicted* Cardona's testimony (and Manuel's proposed testimony) about the provenance of these marks. *See, e.g.*, Trial Tr. [ECF No. 19-2] at 413–14 ("Q: Okay. And did those scratch marks appear to be fresh? [Detective Sandman:] Yes."); *id.* at 585 ("[Detective Recarey:] I observed a fresh coat of blood on the scratches."). And, indeed, Cardona himself seemed to admit that his scratching propensity wasn't as all-consuming as his testimony would initially suggest. *See id.* at 828–29 (Cardona admitting that he had not scratched his neck in "[a]bout 20 days, 25 days" before trial). Manuel's testimony about the source of the scratch marks would thus have been cumulative of the alternative account Cardona already provided at trial—an alternative story that was belied *both* by Cardona's own statements on the day of the assault *and* by other witness testimony. And, as we've said, "it is reasonable for a state court to conclude that a petitioner suffers no prejudice when the evidence is either weak or cumulative of the testimony presented at trial." *Ponticelli*, 690 F.3d at 1296.

In his Petition, Cardona concedes that Manuel wouldn't have provided "an absolute alibi for the time of the alleged rape." Petition at 9. He argues, instead, that its purpose would've been only to "bolster[ ] [Cardona's] credibility as a witness[.]" *Id.* at 9–10. Two problems with this. *One*, Manuel is Cardona's brother and, "[a]s a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias." *Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995); *accord McWhorter v. Dunn*, 2019 WL 277385, at *45 (N.D. Ala. Jan. 22, 2019). *Two*, as we've explained, Manuel's testimony would've done little more than double down on a false narrative the State had already decisively impeached. Rather than bolster his brother's testimony, in other words, Manuel would have been dismissed as a loving sibling who'd been called upon to echo Cardona's own discredited account. Given this—and in light of the heightened

standard of review § 2254 affords—we cannot say that the state court acted unreasonably in refusing, on the basis of Manuel's duplicative testimony, to give Cardona a new trial. *See Ponticelli*, 690 F.3d at 1296.

We, therefore, **DENY** Ground Three on the merits.

### D. Ground Four

In Ground Four, Cardona criticizes his trial counsel for "failing to call a DNA expert where such testimony would have directly contradicted the State's expert's explanation for a lack of DNA underneath the [victim's] fingernails[.]" Petition at 11. Cardona speculates that his hypothetical DNA expert could've "convince[d] the jury that the lack of male DNA under the alleged victim's fingernails was scientifically inconsistent with the State's argument that the scratches on the Petitioner were made by the alleged victim during the struggle." *Id.* Cardona also says that the expert "would have bolstered the Petitioner's and his brother's innocent explanation for the presence of the scratch wounds[.]" *Id.* at 12. The state postconviction court adopted the State's Response, which had contended that the DNA expert wouldn't have changed the outcome. *See* State's Postconviction Response [ECF No. 18-3] at 165 ("The fact that there may have been in existence a DNA expert who could have testified differently on this tangential issue cannot form the basis of an ineffective claim. It is undisputed that the victim knew the defendant, identified him, and [that] the defendant's DNA was found on a toothbrush located inexplicably in the victim's room after the rape."). The Respondent also points out that Cardona's trial counsel effectively attacked the State's DNA expert, Catherine Cochran, in his closing argument. *See* Response at 35–36 ("In closing argument, counsel strenuously argued there was a lack of DNA testing in this case, placing the blame directly on the state and Cochran.").

Here, too, the state court reasonably applied *Strickland*.[10] Recall that, at trial, the State maintained that the victim had struggled with Cardona during the assault—and that this struggle was the source of the scratch marks police later found on Cardona's body. *See* Trial Tr. [ECF No. 19-2] at 889 ("You can observe the pictures. Are these consistent with someone scratching themselves and wearing a belt? . . . That's consistent with somebody having been in a struggle, [the victim] pushing [him], forcing him away from her so she could get over this."). The State's DNA expert, Ms. Cochran, admitted that no male DNA was found underneath the victim's fingernails. *See id.* at 776 ("A: Male DNA was not detected on the fingernail scrapings, so I did not go any further."). But she also testified that this absence of DNA wasn't fatal to the State's "scratch theory." *See id.* ("Q: Is it uncommon for a person to, say, have scratched an individual and not have any DNA found under those fingernail scrapings? A: Yes, that is not uncommon.").

Cardona's contention here is that there are "significant independent scientific [studies] on the transfer of DNA to fingernails," and that, based on those studies, some hypothetical DNA expert *could've* testified that, "if the scratches on the Petitioner were in fact made by the alleged victim during the struggle, then it is more likely that examination of [the] alleged victim's fingernail scraping would have demonstrated the existence of male DNA." Petition at 11–12; *see also id.* at 12 ("Thus, the lack of DNA found underneath the fingernails in conjunction with these consensus studies could have convincingly undermined the State's theory that the scratches on the Petitioner were left by the alleged victim during the purported struggle."). Cardona made this same claim in state court. *See* Amended Postconviction Motion [ECF No. 18-3] at 129–30 (citing studies for the proposition that "researchers

---

[10] We review a claim that trial counsel was ineffective for failing to call an *expert* witness under the same *Strickland* test. *See Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) ("Dingle argues that his attorney was ineffective for failing to present available expert witnesses . . . . Dingle must show that his lawyer's actions 'fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (quoting *Strickland*, 466 U.S. at 668, 694)).

have found DNA profiles from perpetrators of crime under the fingernails of victims" when a "violent struggle occurred").

For three reasons, we agree with the state court's disposition of this claim. *First*, "mere speculation that missing witnesses would have been helpful is insufficient to meet the petitioner's burden of proof." *Streeter v. United States*, 335 F. App'x 859, 864 (11th Cir. 2009) (citing *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001)); *see also Duran v. Walker*, 223 F. App'x 865, 875 (11th Cir. 2007) ("Duran's claim that an expert witness would have prompted the jury to believe his testimony and disregard the statements he made during the police interview is conclusory and speculative, and does not amount to a showing of prejudice."); *Boykin v. Sec'y, Fla. Dep't of Corr.*, 2018 WL 9439838, at *4 (M.D. Fla. July 5, 2018) ("Evidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." (quoting *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991))). And speculation is all Cardona has. He claims that a DNA expert would have testified that the lack of male DNA underneath the victim's fingernails is "proof either that someone else committed this crime, or that the crime did not happen." Petition at 12. But Cardona hasn't even identified a single DNA expert who was prepared to come into court and say that. And his mere say-so on this issue is plainly insufficient to justify a new trial.

*Second*, what would this DNA expert have said anyway? If Cardona is to be believed, that expert would've noted only that "researchers have found DNA profiles from perpetrators of crime under the fingernails of victims" when a "violent struggle occurred[.]" Amended Postconviction Motion [ECF No. 18-3] at 129–30. So what? The State's DNA expert already told the jurors that. *See* Trial Tr. [ECF No. 19-2] at 783–84 ("Q: Would it be fair to say that you have gathered fingernail scraping evidence for DNA testing from which DNA is available for testing in more than a hundred cases, yes

or no? A: I really can't say how many cases, if it was a hundred cases or not. I would say probably—I really can't answer that question to a count of how many that I obtained a DNA profile from."). And Cardona's lawyer did a great job during his closing argument of highlighting this weakness in the State's case. *See id.* at 880–81 ("But what [Ms. Cochran] did was, she came into this courtroom and just spoke to you, I tested this and I tested that. At no point in this courtroom did she point to any item of evidence to say to you that I tested that and I tested this and beyond a reasonable doubt that was the DNA of Mr. Cardona.").

In any event, the question Cardona wants us to address is whether DNA evidence is *always* found underneath victims' fingernails—and the answer to that question is, of course, no. *See id.* at 782 ("Q: Now, you testified earlier that it is not uncommon for DNA not to be recovered or accessible for testing from fingernail scrapings; is that right? A: Yes, DNA is not always obtained from fingernail scrapings."). Since no reasonable DNA expert would've said otherwise—and since Cardona hasn't identified one who would—Cardona's ask here is (essentially) for a competing DNA expert who would've regurgitated for the jury the same testimony Ms. Cochran had already provided. You don't get a new trial for that.

*Third*, the evidence of Cardona's guilt was overwhelming—even without the scratch marks. As we've said, not only did the victim credibly identify Cardona as the perpetrator, but Cardona's DNA was extracted from a toothbrush that was found in the victim's bedroom on the morning after the rape. *See* Trial Tr. [ECF No. 19-2] at 614–15 ("Q: And did you get a good look at [the perpetrator's] face? A: Yes, I did. Q: And did you recognize the face of that person? A: Yes, I did. Q: How did you recognize the face of that person? A: I had seen this person around on the ground[s] of the club. . . . Q: Okay. So you had seen him at work before, but you just didn't know his name? A: Yes."); *id.* at 778 (DNA expert testifying that "Mr. Cardona is the source of the DNA profile obtained from the toothbrush" that was found in the victim's bedroom on the morning after the sexual battery). There's

thus no reasonable probability that, whatever the DNA expert had said about the scratches, the outcome of the trial would have been different. *See Dieter v. Florida*, 759 F. App'x 885, 892 (11th Cir. 2019) ("It is not reasonably probable that Watson's testimony would have changed the outcome of Dieter's conviction . . . . The State also introduced a taped telephone statement made by Dieter . . . in which he admitted that he touched a five-year-old girl. The jury's verdict was further supported by the victim's testimony, which was corroborated by DNA evidence.").

Ground Four, in short, is **DENIED**.

### E. Ground Five

Ground Five advances a claim of cumulative error. *See* Petition at 14 ("The State court's denial [sic] to perform the required cumulative prejudice analysis was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding and violated Petitioner's Due Process."). Although the Respondent takes no position on whether Ground Five has been procedurally defaulted, we can simply "skip over the procedural default analysis" when a claim, on its face, cannot survive *de novo* review. *Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020). "The cumulative error doctrine provides that an aggregation of non-reversible errors can yield the denial of the constitutional right to a fair trial." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (cleaned up). Because Cardona has failed to show that counsel committed *any* errors—and since he hasn't established any prejudice—his cumulative-error claim necessarily fails. *See id.* ("None of [the petitioner's] individual claims of error or prejudice have any merit, and therefore we have nothing to accumulate."). Ground Five, in sum, is **DENIED**.

### EVIDENTIARY HEARING

We won't hold an evidentiary hearing in this case. "[W]hen the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.'" *Cullen v. Pinholster*, 563 U.S. 170, 183 (2011) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474

(2007)). The claims we resolved on the merits under § 2254(d) require no factual development. *See Williams*, 529 U.S. at 444 ("The Court of Appeals rejected this claim on the merits under § 2254(d)(1), so it is unnecessary to reach the question whether § 2254(e)(2) would permit [or restrict] a hearing on the claim."). As for Ground One, we don't need a hearing because "the record refutes the applicant's factual allegations or otherwise precludes habeas relief[.]" *Schriro*, 550 U.S. at 474.

### CERTIFICATE OF APPEALABILITY

A Certificate of Appealability ("COA") is appropriate only when the movant makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To deserve a COA, therefore, the movant must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "Where a district court has disposed of claims . . . on procedural grounds, a COA will be granted only if the court concludes that 'jurists of reason' would find it debatable both 'whether the petition states a valid claim of the denial of a constitutional right' and 'whether the district court was correct in its procedural ruling.'" *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001) (quoting *Franklin v. Hightower*, 215 F.3d 1196, 1199 (11th Cir. 2000)). Reasonable jurists wouldn't find our resolution of the constitutional claims in Grounds Two, Three, Four, and Five debatable or wrong. Nor would jurists of reason debate the correctness of our procedural ruling on Ground One. We thus **DENY** any request for a COA.

\*\*\*

Having carefully reviewed the record and the governing law, we hereby **ORDER AND ADJUDGE** that the Petition is **DISMISSED** as to Ground One and **DENIED** as to the remaining claims, that a COA is **DENIED**, that any request for an evidentiary hearing is **DENIED**, that all deadlines are **TERMINATED**, and that any pending motions are **DENIED** as moot. The Clerk shall **CLOSE** this case.

**DONE AND ORDERED** in the Southern District of Florida, this 14th day of June 2022.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    Esdras Cardona, *pro se*
       counsel of record